UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAVIER SAN RAMON,<br><br>          Plaintiff,<br><br>  v.<br><br>MICHAEL J. ASTRUE, Commissioner of<br>Social Security Administration,<br><br>          Defendant. | Civil No. 09cv2400-BEN (CAB)<br><br>**REPORT AND RECOMMENDATION TO DENY PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>**[Doc. Nos. 16 & 17]** |

### I. Introduction

Plaintiff Javier San Ramon brings this action pursuant to 405(g)[1], to obtain judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for Social Security Disability Insurance Benefits ("SSDI") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401, et seq. Plaintiff has filed a motion for summary judgment. [Doc. No. 16.] In that motion, Plaintiff argues he should have been found "disabled" under the Act and that the Appeals Council's decision adopting Administrative Law Judge ("ALJ") David L. Wurzel's decision

---

[1] 42 U.S.C. § 405(g) provides:

Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party . . . may obtain a review of such decision by a civil action . . . brought in the district court of the United States. . . . The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive.

of April 1, 2008, denying him benefits should be reversed because the ALJ's decision is not supported by substantial evidence and is based on legal error. The Commissioner has filed a cross-motion for summary judgment. [Doc. No. 17.] In that motion, the Commissioner argues the ALJ's decision is supported by substantial evidence and is not based on legal error.

Pursuant to Southern District of California Local Civil Rule 7.1(d)(1), the Court finds these motions may be decided on the papers and that no oral argument is necessary. After careful consideration of the papers, the administrative record, and the applicable law, this Court recommends the ALJ's decision be **AFFIRMED**, Plaintiff's motion for summary judgment be **DENIED**, and the Commissioner's cross-motion for summary judgment be **GRANTED**.

## II. Procedural History

Plaintiff applied for SSDI benefits on January 17, 2006. (Administrative Record ("AR") at 234-44.) Plaintiff alleged disability as of July 4, 1999 due to mold injury, chemical sensitivity and chronic fatigue, dizziness, cloudy thinking, insomnia, nervous system pain, joint pain, various allergic reactions, and chronic asthma. (AR at 252.) On June 20, 2006, the Social Security Administration ("Administration") determined Plaintiff was not disabled from the period of July 4, 1999 to June 30, 2000, his date last insured ("DLI"),[2] and denied him benefits. (AR at 178-82.) Plaintiff requested reconsideration of his application, and the Administration denied benefits again after reconsideration. (AR at 183-88.) On February 28, 2007, Plaintiff requested an administrative hearing before an ALJ. (AR at 189.)

On March 19, 2008, the ALJ conducted a hearing to consider the merits of Plaintiff's application. (AR at 152-59.) This hearing resulted in his application being denied by the ALJ in a written decision dated April 1, 2008. (AR at 162-77.) Plaintiff disagreed with the ALJ's decision, and on May 2, 2008, he requested an Appeals Council Review of the decision. (AR at 150-51.) On August 27, 2009, the Appeals Council found there was no basis for granting Plaintiff's request for

---

[2] To be entitled to disability insurance benefits, Plaintiff "must establish that [his] disability existed on or before" the date his insured status expired. *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1998); *see also Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1460 (9th Cir. 1995) (social security statutory scheme requires disability to be continuously disabling from time of onset during insured status to time of application for benefits, if individual applies for benefits for current disability after expiration of insured status). In this case, Plaintiff's date last insured was June 30, 2000. (AR at 246.)

1  review and affirmed the ALJ's decision, which became the final decision of the Commissioner. (AR
2  at 1-3.)
3       On October 27, 2009, after having exhausted all administrative remedies, Plaintiff initiated
4  this action challenging the proceedings in connection with the Commissioner adopting the ALJ's
5  decision. [Doc. No. 1.] On December 14, 2009, the Commissioner filed an answer to Plaintiff's
6  complaint. [Doc. No. 3.] On December 28, 2009, District Judge Roger T. Benitez referred all
7  matters in this action to Magistrate Judge Cathy Ann Bencivengo for a report and recommendation.
8  [Doc. No. 8.] On June 25, 2010, Plaintiff filed his motion for summary judgment, requesting that
9  the Court reverse the ALJ's decision and remand for payment of benefits. [Doc. No. 16.] On July
10 16, 2010, Defendant filed his cross-motion for summary judgment, requesting that the ALJ's
11 decision be affirmed. [Doc. No. 17.]

### III. Factual Background

**A. The Requests for Continuance**

The case was originally set for an administrative hearing before the ALJ on December 20, 2007. (AR at 198.) Plaintiff requested a continuance, claiming that he was having surgery on his jaw in Tijuana, Mexico. (AR at 207-09.) He also claimed he was seeking legal representation and needed records from Dr. G. Heuser. (AR at 209.) The ALJ granted the continuance, but also informed Plaintiff that he would not grant any further continuances "without a very good reason." (AR at 210.) The hearing was rescheduled for March 19, 2008. (AR at 213.) On March 12, 2008, Michael J. Walkup, Plaintiff's attorney, wrote to the ALJ requesting another continuance. He claimed he needed more time to obtain medical records. (AR at 229.) He also requested that he and Plaintiff appear at the administrative hearing by telephone, because they were both disabled. (*Id.*) The ALJ denied the request for a continuance and denied the request for telephonic appearance. (AR at 310.)

**B. Administrative Hearing**

The administrative hearing scheduled for March 19, 2008 went forward, and Plaintiff personally appeared at the hearing without his attorney. (AR at 154-59.) Mr. Walkup, Plaintiff's attorney, had advised him not to answer questions. (AR at 155.) Therefore, the ALJ had no

testimony from Plaintiff. The ALJ indicated that Plaintiff had submitted no work history, but it was his understanding that Plaintiff had worked as an engineer at some point. (AR at 156.)

Mary Jesko testified at the administrative hearing as a vocational expert. (AR at 156.) The ALJ presented a hypothetical of a person with the following limitations: a 51-year-old person with a high school and four-year college degree; able to lift and carry up to 10 pounds, sit for six hours and stand alone for two hours in an eight hour day, *i.e.*, a sedentary exertional level; occasionally climbing ramps and stairs; occasionally stooping; moderate exposure to chemicals, dust, mold, perfume and cologne; and no close or frequent personal contact with supervisors or co-workers. (AR at 157.) Ms. Jesko said she could not answer whether Plaintiff could return to his past work, but based on the limitations the ALJ set out, she concluded that there were jobs that existed for Plaintiff to do. Examples of the jobs included optical lens assembler, final assembler, and bench hand. (AR at 158.)

**C. Medical Evidence in the Record**

    1. Steven R. Nusinow, M.D.

Treatment notes from Dr. Nusinow indicate that Plaintiff first saw him on November 3, 2000. (AR at 382-88.) At the first visit, Plaintiff complained of a mild cough and sore throat. (AR at 382.) Plaintiff also reported extreme fatigue for the last one and a half years, for which he was seeing a toxicologist. An examination revealed "minimal pale swelling nose with clear drainage, throat and ears clear." Plaintiff visited Dr. Nusinow again on February 5, 2001, after he had been rear ended. He complained of pain in his back, neck and buttocks. Dr. Nusinow found "whiplash injury with acute cervical, thoracic and lumbar strain." (*Id.*) Plaintiff continued to see Dr. Nusinow several times throughout the year 2002, and a few times in 2003, 2006 and 2007. In 2002, he complained of fatigue, gastrointestinal problems, and pain in his knees. (AR at 383-85.) In 2003, he complained of chemical sensitivities. (AR at 385.) When he returned in 2006, he again complained of chemical sensitivities. It appears Dr. Nusinow spent some time with him reviewing his medical record and discussing his issues. He did not have any acute complaints. (AR at 386-87.) In 2007, Plaintiff also complained of chemical sensitivities. (AR at 387.) Plaintiff reported to Dr. Nusinow that he was going to have two of his teeth removed to minimize the effects of mercury toxicity. (*Id.*)

2. Jonathan Wasserberger, M.D.

Dr. Wasserberger submitted an interval update dated May 10, 2001. (AR at 313-15.) He indicated he is a medical toxicologist and had been seeing Plaintiff for toxigenic mold exposure. He moved out of the apartment in July 2000, but he became sick again when he reentered the apartment to pick up his belongings. He experienced memory dysfunction and fatigue. In addition, Plaintiff experienced multiple chemical sensitivity. He tried to move into a new apartment, but he became dizzy and fatigued due to the chemicals in the apartment. Dr. Wasserberger reported that Plaintiff used a charcoal filter mask in public. (AR at 313.) Plaintiff informed Dr. Wasserberger that it did help his fatigue, but it caused him to feel social isolation, because people thought he had HIV or tuberculosis. Dr. Wasserberger reported that Plaintiff's lab tests showed he was positive for "immune suppression" and for the "toxigenic mold Stachybotrys." (AR at 314.) All other lab tests were normal.

Dr. Wasserberger's assessment was that:

> [T]he patient has a mycotoxicosis that has resulted in chronic fatigue immunosuppression syndrome and memory dysfunction. He has sinusitis, proven by MRI. He also has onychomycosis which is most annoying to him at this time and changing his life most dramatically at this time; this is a manifestation of multiple chemical sensitivities.

(*Id.*) Dr. Wasserberger believed Plaintiff could not go to work. (AR at 313.)

On May 23, 2002, Dr. Wasserberger saw Plaintiff for a medical toxicology follow-up visit. Dr. Wasserberger documented that Plaintiff's symptoms of fatigue, tremors, memory loss and sinus problems had improved. Although the doctor noted that Plaintiff still had multiple chemical sensitivities, he also noted that Plaintiff was feeling better since being out of the toxic environment and was now living in a "clean home." (AR at 344.)

3. William James Rea, M.D.

Dr. Rea submitted a letter dated January 22, 2002. (AR at 342-43.) In the letter, he stated that Plaintiff first consulted with him on June 19, 2001 with complaints of chronic fatigue, chemical sensitivity and allergies. (AR at 342.) At that time, Plaintiff reported that he had been well until 1999, when he started to feel tired constantly. He started to see Dr. Wasserberger on October 12, 2000, and Dr. Wasserberger suspected Plaintiff had a mold exposure at home. Dr. Rea diagnosed

Plaintiff as having immune deregulation, allergic rhinitis, food sensitivity, mold sensitivity, pollen sensitivity, chemical sensitivity, chronic fatigue and fibromyalgia. (*Id.*) Dr. Rea's treatment for Plaintiff involved "an internal environment conducive for healing." (AR at 343.) In Dr. Rea's opinion, "a working environment is unable to comply with the prescribed treatment plan. . . . This patient must rigidly avoid public buildings or any physical environment where exposure would occur." Dr. Rea believed Plaintiff was disabled and unable to engage in any type of work. (*Id.*)

### 4. State Agency Medical Consultants

Dr. Rose reviewed the medical records to perform a Psychiatric Review Technique but indicated there was insufficient evidence to make a determination on disability. (AR at 360.) Dr. Spellman also reviewed the medical records on December 26, 2006 and found insufficient evidence to make a disability determination for the period July 4, 1999 to June 30, 2000. (AR at 375.)

### 5. Gunnar Heuser, M.D.

In a letter dated May 26, 2009, Dr. Heuser reported that Plaintiff had been his patient since April 2000 and had seen him at intervals over the years, last on March 2, 2009. (AR at 23.) Dr. Heuser reported that Plaintiff's complaints included impairment of brain, lung and immune functions due to mold exposure. (*Id.*) Dr. Heuser believed Plaintiff to be totally disabled, because he reacts strongly to everyday chemicals in his environment. (AR at 24.) No treatment notes accompanied Dr. Heuser's letter.

## D.  ALJ's findings

After a discussion of the evidence in the record, the ALJ determined that Plaintiff was not entitled to SSDI benefits during the insured period of July 4, 1999 to June 30, 2000. (AR at 170-77.) In making his determination, the ALJ found that Plaintiff had the following medically determinable impairments: sensitivity to chemicals and fumes; onychomycosis, right foot; allergic rhinitis; and sinusitis. (AR at 171.) Despite these impairments, the ALJ found that Plaintiff had:

> the residual functional capacity to perform work activity at the sedentary exertional level, lifting and carrying up to ten pounds, sitting for six hours per eight-hour workday, and standing and walking for two hours per eight-hour workday; with the following nonexertional limitations: never climbing ladders, ropes or scaffolds; never balancing, kneeling or crawling; occasionally climbing ramps and stairs; occasionally stooping and crouching; avoiding even moderate exposure to chemicals, dust, fumes, gases, molds, perfumes and colognes; and limited to unskilled work with no close or frequent interpersonal contact with supervisors, co-workers, or the public.

(*Id.*)

The ALJ found that there was no evidence that Plaintiff sought medical treatment until October 2000, four months after his DLI. The ALJ also found Plaintiff's self-reporting inconsistent and unreliable. (AR at 172.) He had reported to Dr. Wasserberger that he had started feeling ill in June 2000, but he reported to Dr. Nusinow that he started having "extreme fatigue" in May 1999. The ALJ also noted that Plaintiff was well enough to drive and be out in public, because in March 2000 and February 2001, he had been driving and was rear-ended. He was also well enough in March 2002 to go to Tijuana for dental treatments. (*Id.*) The ALJ gave little weight to the functional assessments of Plaintiff's two treating physicians, Dr. Rea and Dr. Wasserberger, because he found they were not very credible. The ALJ, however, did give Plaintiff the benefit of the doubt and found Plaintiff was "limited" as Dr. Wasserberger believed him to be. (AR at 175.) Finally, the ALJ gave moderate weight to the opinion of Dr. Spellman, the state agency medical consultant, who found there was insufficient evidence to establish a medically determinable impairment. (*Id.*)

Giving the Plaintiff the "maximum reasonable benefit of the doubt," the ALJ found that Plaintiff did have medically determinable impairments prior to June 30, 2000. (AR at 175.) Because Plaintiff did not submit a work history report and did not testify at the administrative hearing, the ALJ assumed that Plaintiff was unable to perform his past relevant work. (AR at 176.) The ALJ then concluded, based on the testimony of the vocational expert, that Plaintiff could perform work existing in significant numbers in the national economy. (AR at 177.) Therefore, a finding of "not disabled" was appropriate under the Act. (*Id.*)

## IV. Discussion

### A. Legal Standard

The Social Security Act authorizes payment of SSDI benefits to individuals who have an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The disabling impairment must be so severe that the claimant is not only unable to do his previous work, but, considering age, education, and work experience, cannot engage in any kind of substantial

gainful work that exists in the national economy. 42 U.S.C. § 423(d)(2)(A).

The Commissioner makes this assessment by a five-step analysis. First, the Commissioner determines whether a claimant is engaged in "substantial gainful activity." If so, the claimant is not disabled. 20 C.F.R. § 404.1520(b). Second, the Commissioner determines whether the claimant has a "severe impairment or combination of impairments" that significantly limits the claimant's physical or mental ability to do basic work activities. If not, the claimant is not disabled. 20 C.F.R. § 404.1520(c). Third, the medical evidence of the claimant's impairment is compared to a list of impairments that are presumed severe enough to preclude work; if the claimant's impairment meets or equals one of the listed impairments, benefits are awarded. 20 C.F.R. § 404.1520(d). Fourth, if the impairment meets or equals one of the listed impairments, the Commissioner determines whether the claimant can do his past relevant work. If the claimant can do his past work, benefits are denied. 20 C.F.R. § 404.1520(e). If the claimant cannot perform his past relevant work, the burden shifts to the Commissioner. In step five, the Commissioner must establish that the claimant can perform other work. 20 C.F.R. § 404.1520(f). If the Commissioner meets this burden and proves that the claimant is able to perform other work that exists in the national economy, then benefits are denied.

Sections 405(g) and 421(d) of the Social Security Act allow unsuccessful applicants to seek judicial review of a final agency decision of the Commissioner. 42 U.S.C. §§ 405(g), 421(d). The scope of judicial review is limited, however, and the Commissioner's denial of benefits "will be disturbed only if it is not supported by substantial evidence or is based on legal error." *Brawner v. Sec'y of Health & Human Servs.*, 839 F.2d 432, 433 (9th Cir. 1988) (citing *Green v. Heckler*, 803 F.2d 528, 529 (9th Cir. 1986)).

Substantial evidence means "more than a mere scintilla" but less than a preponderance. *Sandqathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997). "[I]t is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)). The court must consider the record as a whole, weighing both the evidence that supports and detracts from the Commissioner's conclusions. *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 576 (9th Cir. 1988). If the evidence supports more than one rational interpretation, the court must uphold the ALJ's decision. *Allen v.*

*Heckler*, 749 F.2d 577, 579 (9th Cir. 1984). When the evidence is inconclusive, "questions of credibility and resolution of conflicts in the testimony are functions solely of the Secretary." *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982).

The ALJ has a special duty in social security cases to fully and fairly develop the record in order to make an informed decision on a claimant's entitlement to disability benefits. *DeLorme v. Sullivan*, 924 F.2d 841, 849 (9th Cir. 1991). Because disability hearings are not adversarial in nature, the ALJ must "inform himself about the facts relevant to his decision," even if the claimant is represented by counsel. *Id.* (quoting *Heckler v. Campbell*, 461 U.S. 458, 471 n.1 (1983)).

Even if the reviewing court finds that substantial evidence supports the ALJ's conclusions, the court must set aside the decision if the ALJ failed to apply the proper legal standards in weighing the evidence and reaching his or her decision. *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir. 1978). Section 405(g) permits a court to enter a judgment affirming, modifying, or reversing the Commissioner's decision. 42 U.S.C. § 405(g). The reviewing court may also remand the matter to the Commissioner for further proceedings. *Id.*

**B. Plaintiff's Claims**

Plaintiff asserts three grounds for reversal of the ALJ's decision. First, he asserts that the Appeals Council failed to give clear and convincing reasons for rejecting the opinion of Dr. Heuser. Second, he argues that it was legal error for the ALJ to go forward with the administrative hearing without Plaintiff's attorney. Third, he argues that the ALJ did not give clear and convincing reasons for rejecting the opinions of Drs. Rea and Wasserberger. Based upon these grounds, Plaintiff contends that the Court can now find him disabled and award benefits. The Court considers each of Plaintiff's arguments below.

**1. ALJ's rejection of Drs. Rea's and Wasserberger's opinions**

Plaintiff argues that the ALJ did not give clear and convincing reasons for rejecting the opinions of Dr. Rea and Dr. Wasserberger. (Pl.'s Mem. 8.) Plaintiff claims the ALJ "attacked" Drs. Rea and Wasserberger and argues that because their opinions are uncontradicted, the ALJ erred in not accepting their opinions.

The Ninth Circuit distinguishes among the opinions of three types of physicians: (1) those

who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians). *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). The ALJ must give the medical opinion of a treating physician "special weight," because a treating physician "is employed to cure and has a greater opportunity to know and observe the patient as an individual." *Andrews*, 53 F.3d at 1041 (citation omitted); *Rodriguez v. Bowen*, 876 F.2d 759, 761 (9th Cir.1989). However, the treating physician's opinion on the ultimate issue of disability is not necessarily conclusive. *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992). The ALJ may disregard the treating physician's opinion if the ALJ sets forth "specific, legitimate reasons . . . based on substantial evidence." *Rodriguez*, 876 F.2d at 762. The ALJ can meet this burden of substantial evidence by "providing a detailed summary of the facts and conflicting clinical evidence, along with a reasoned interpretation thereof." *Id.* Finally, the ALJ need not accept an opinion of a treating physician if it is "conclusionary and brief and unsupported by clinical findings." *Matney*, 981 F.2d at 1019.

Dr. Rea submitted a letter dated January 22, 2002. (AR at 342-43.) In the letter, he stated that Plaintiff first consulted with him on June 19, 2001 with complaints of chronic fatigue, chemical sensitivity and allergies. (AR at 342.) At that time, Plaintiff reported that he had been well until 1999, when he started to feel tired constantly. Dr. Rea diagnosed Plaintiff as having immune deregulation, allergic rhinitis, food sensitivity, molds sensitivity, pollen sensitivity, chemical sensitivity, chronic fatigue and fibromyalgia. (*Id.*) In Dr. Rea's opinion, "This patient must rigidly avoid public buildings or any physical environment where exposure would occur." (AR at 343.) Dr. Rea believed Plaintiff was disabled and unable to engage in any type of work. (*Id.*)

In his written opinion, the ALJ noted that Plaintiff began seeing Dr. Rea, one year after the DLI. (AR at 173.) Dr. Rea reported that Plaintiff began seeing Dr. Wasserberger on October 12, 2000, four months after the DLI. (*Id.*) The ALJ's assessment of Dr. Rea's credibility was as follows:

> I give little weight to the opinions of Dr. Rea. If he sounds like a charlatan, the Texas Medical Board thinks so too. On August 24, 2007, the Texas Medical Board filed a formal complaint against Dr. Rea, charging him with conducting diagnostic tests such as "pupillography" for which there is "absolutely no basis in scientific literature," checking for "abnormal" conditions having "no clinical relevance," and using skin testing for which there is "no scientific basis" to diagnose such disorders as "allergy

> to neurotransmitters" when "in fact, there is no such diagnosis" [(AR at 291-92)]. The Texas Medical Board further charges that Dr. Rea "demonstrates a substandard knowledge of basic immunology," that he "repeatedly fails to appropriately apply the results of his testing," and that his "unscientific tests mislead patients into believing they have either an autoimmune or immunological basis for their complaints, when in fact, they do not" [(AR at 293)]. The Texas Medical Board further charges that Dr. Rea's "diagnoses are not supported by accurate interpretation of valid tests," including "diagnoses of deficiencies in immune function when the tests themselves show that this is not the case," and that Dr. Rea's treatments are "nonsensical and can be harmful," such as "heat depuration therapy" which "is simply a sauna" and "has no known therapeutic indication of the diseases [Dr. Rea] purports to treat" and "injections of neurotransmitters" and "other chemicals which can be a dangerous practice." (*Id.*) The Texas Medical Board further charges that Dr. Rea's "training and certification do not qualify him to perform his clinical practice" as he is "neither board-certified nor trained as an allergist," since his "training in the 1970's was in the field of thoracic surgery," and "he claims to have board-certification in the field of environmental medicine, which is not recognized by the American Board of Internal Medicine." (*Id.*)
>
> . . .
>
> Dr. Rea's claim that the claimant's "strachybotrys exposure profile" was "positive for the IgG antibody" is [at] best misleading, as serology reports on blood samples collected on October 18, 2000, and September 4, 2001, were both well within the normal range [(AR at 330)].
>
> Dr. Rea's diagnosis of "fibromyalgia" is completely unsupported. Fibromyalgia is an impairment with well-defined diagnostic criteria published by the American College of Rheumatologists in 1990. Those diagnostic criteria require two clinical findings, one subjective, the other objective: First, subjective complaint of widespread pain on both sides of the body, both above and below waist level, persisting for at least three months; and second, "positive" clinical findings on digital palpation of at least 11 of 18 precisely defined anatomical tender points. The diagnostic term, "positive," is defined with specificity and precision as a "painful" not merely a "tender" response to digital palpation at a prescribed force of about four kilograms (about 10 pounds). The record contains no findings on physical examination that would even begin to meet the diagnostic criteria for fibromyalgia.

(AR at 173-74.)

Despite Plaintiff's claim that the ALJ erred in rejecting Dr. Rea's opinion, the ALJ gave a number of "specific, legitimate reasons . . . based on substantial evidence." *Rodriguez*, 876 F.2d at 762. The first was that Dr. Rea's letter indicates that Plaintiff saw both Dr. Rea and Dr. Wasserberger after his DLI.[3] The ALJ also cited a complaint against Dr. Rea from the Texas Medical Board. Dr. Rea had diagnosed Plaintiff with "immune deregulation," and according to the charges by the Texas Medical Board, Dr. Rea had diagnosed patients with "deficiencies in immune

---

[3] The rest of Dr. Rea's letter, then, is irrelevant, because it does not speak to Plaintiff's condition during the period for which he seeks benefits. Nevertheless, the Court examines the ALJ's other reasons for rejecting Dr. Rea's opinions as well.

function when the tests themselves show that this is not the case." (AR at 293.) Therefore, the charges by the Texas Medical Board called into question Dr. Rea's diagnosis of "chemical sensitivity" and his assessment that Plaintiff was disabled. The charges by the Texas Medical Board were a legitimate, specific reason for the ALJ to question Dr. Rea's credibility.[4] The ALJ also cited inconsistencies between Dr. Rea's diagnoses and the lab reports in the record. Taken together, the ALJ provided specific, legitimate reasons supported by substantial evidence for rejecting Dr. Rea's opinion.

As it relates to Dr. Wasserberger, Dr. Wasserberger submitted an interval update dated May 10, 2001, and a medical toxicology follow-up visit report dated May 23, 2002. (AR at 313-15, 344.) He reported that Plaintiff was exposed to toxigenic mold in his apartment. His assessment was that Plaintiff could not go to work, because of "multiple chemical sensitivities and chronic fatigue and memory dysfunctions." (AR at 313.) Dr. Wasserberger diagnosed Plaintiff with "a mycotoxicosis that has resulted in chronic fatigue immunosuppression syndrome and memory dysfunction," "sinusitis, proven by MRI," and onychomycosis. (AR at 314.) In May 2002, Dr. Wasserberger reported that Plaintiff's symptoms of fatigue, tremors, memory loss and sinus problems had improved since being out of the toxic environment. (AR at 344.)

The ALJ analyzed Dr. Wasserberger's opinion as follows:

> Like Dr. Rea, he also states that the claimant's strachybotrys serology was "positive" when it was well within the normal range [(AR 330, 335)].
>
> [The] diagnosis of mycotoxicosis is not supported by MRI of the brain done in November 2000 on suspicion of mycotoxicosis. In fact, the MRI was perfectly normal except for evidence of sinusitis [(AR at 354)].
>
> Although I am not impressed with Dr. Wasserberger's opinions, I have found that the claimant is "limited" as he opined. I note that Dr. Wasserberger himself noted that May 23, 2002, the claimant had realized "marked improvement" and was no longer wearing a mask [(AR at 345)].
>
> There is no record of complaint or treatment for any toxicological or allergic impairment prior to October 2000, which is four months after DLI in June 2000. I am giving the claimant maximum reasonable benefit of the doubt in finding that he did have medically determinable impairments prior to DLI.

---

[4] Plaintiff argues that these charges were dropped and the person who brought the charges was forced to resign from the board. (Pl.'s Mem. 8.) As evidence of this claim, Plaintiff cites to some typed up notes from Dan O. Harper, M.D. (AR at 6-8.) It is unclear who Dan O. Harper is and what authority he has to report on the disposition of the Texas Medical Board case.

(AR at 175.)

Plaintiff takes issue with the ALJ's "attack" on Dr. Wasserberger's claim that he was board certified in toxicology. Plaintiff claims, "ALJ Wurzel is wrong, as the American Board of Toxicology would attest." (Pl.'s Mem. 8.) Plaintiff then cites a website for the American Board of Toxicology, which provides no information about Dr. Wasserberger's board certification. Plaintiff provides nothing further to support his argument that the ALJ erred in rejecting Dr. Wasserberger's opinion. In fact, the ALJ gave Plaintiff the "maximum benefit" of the doubt and did credit some of Dr. Wasserberger's opinion regarding Plaintiff's disability. The ALJ, however, did cite reasons that put Dr. Wasserberger's opinion into doubt. For one, Dr. Wasserberger's opinion was incongruous with the lab reports. And more importantly, Dr. Wasserberger provided no record of treatment or examination for the period at issue, between July 4, 1999 and June 30, 2000. The Court finds these are specific, legitimate reasons, based on substantial evidence, to reject Dr. Wasserberger's opinion.

**2. ALJ's decision to go forward without Plaintiff's attorney**

Plaintiff also argues that it was legal error for the ALJ to go forward with the administrative hearing without Plaintiff's attorney. (Pl.'s Mem. 6-7.) Plaintiff contends that his attorney could not travel, and the ALJ refused to allow Mr. Walkup to appear by telephone, even though he was "ready, willing, and able" to appear by telephone. (*Id.* at 7.) Plaintiff argues that he "has a statutory right to be represented by an attorney of his choice." (*Id.*)

A Social Security claimant has a statutory right to be represented by counsel at an administrative hearing. 42 U.S.C. § 406[5]; 20 C.F.R. §§ 404.1700, 416.1500. Although the absence of counsel, standing alone, does not deprive a claimant of a fair hearing, the Commissioner has a duty to inform the claimant of the right to counsel, so that the claimant may decide knowingly whether he or she wishes to waive this right. *Edwards v. Sullivan*, 937 F.2d 580, 585 (11th Cir. 1991); *Thompson v. Sullivan*, 933 F.2d 581, 584 (7th Cir. 1991); *Clark v. Schweiker*, 652 F.2d 399, 403 (5th Cir. 1981). A claimant must be informed not only of his or her right to counsel, but of the

---

[5] The statute states, in pertinent part, "The Commissioner of Social Security shall notify each claimant in writing, together with the notice to such claimant of an adverse determination, of the options for obtaining attorneys to represent individuals in presenting their cases before the Commissioner of Social Security. Such notification shall also advise the claimant of the availability to qualifying claims of legal services organizations which provide legal services free of charge." 42 U.S.C. § 406(c).

1  importance of having an attorney, of the availability of free legal services to represent indigent
2  claimants, and the limits on fees to private counsel to twenty-five percent of retroactive benefits.
3  *Binion v. Shalala*, 13 F.3d 243, 245 (7th Cir. 1994); *Smith v. Schweiker*, 677 F.2d 826, 829 (11th
4  Cir. 1982); *Clark*, 652 F.2d at 403; *see also Blom v. Barnhart*, No. 04-C-0912, 363 F. Supp. 2d
5  1041, 1046 (E.D. Wis. Mar. 26, 2005) (finding uninformed waiver invalid even though claimant was
6  an attorney).

7        Here, Plaintiff's attorney, Michael J. Walkup, had requested that he and Plaintiff appear
8  telephonically at the administrative hearing, because they were both disabled. (AR at 229.) The ALJ
9  denied the request. (AR at 310.) The ALJ addressed this issue in his written opinion:

> I know nothing about attorney Walkup beyond what he alleges in his letters of March 12th and 14th, 2008. His allegations about the claimant's ability to attend did not make any sense. In the aforementioned letter of March 14, 2008, he alleged that he too suffered from "similar problems" as the claimant rendering him unable to travel or to attend hearings in person, although he allegedly had appeared by telephone for "several years" in hearings "all over the country." He said he did not appear in person at hearings even in his own area of Chicago, as he develops "asthmatic reactions to paper product" and would "likely have a problem sitting in your waiting room in proximity to the copier." He would not be able, he said, to "review a paper file," and ["]may also have difficulty around people who wear scented products or with any recent office redecorating or construction." He said he was "receiving disability benefits" himself.
>
> With his claimed hypersensitivity to paper products, one fairly wonders how attorney Walkup reviewed files prior to the recent adoption of electronic files. One also wonders how he is able to receive disability benefits while working for years as an attorney under the standard fee agreement in cases all over the country. Taking together, attorney Walkup's allegations do not make sense.
>
> In any event, I did instruct my clerk to advise attorney Walkup that we would accommodate his alleged disability. This is an "electronic file" case not requiring review of paper products. We have four client conference rooms off our waiting room that are private rooms not containing copiers or any other paper products. I do not wear "scent" of any kind, and I specifically asked the court reporter and vocational expert appearing at the claimant's hearing not to wear any either. On the morning of the hearing, I confirmed that they did receive my request and that they had complied with it. I believe that these were reasonable accommodations.

(AR at 168.)

      The ALJ had reviewed Mr. Walkup's request to appear telephonically and made accommodations for Mr. Walkup's "paper intolerance" but, in his discretion, decided that it was not necessary for him to appear telephonically. While Plaintiff argues that he has a right to be represented by an attorney of his choice, he does not cite to any authority that requires the ALJ to

permit that attorney to appear telephonically. It is not uncommon for attorneys to travel from out of town to appear at hearings, so Plaintiff' argument that he chose "an attorney from out of town" is unconvincing. When Plaintiff appeared at the administrative hearing, he informed the ALJ that his attorney had advised him not to answer any questions. (AR at 154-55.) He actually indicated, "Well, frankly, I'd much rather prefer answer questions, but the attorney--" (AR at 155.) But when the ALJ asked him to give a "clear yes or no" whether he was going to answer questions, he said no. (*Id.*) Even if the ALJ had erred by not allowing Mr. Walkup to appear telephonically, Plaintiff fails to establish that he was prejudiced.

Although a Social Security claimant has the right to be represented by counsel at an administrative hearing, the "[l]ack of counsel does not affect the validity of the hearing unless the [claimant] can demonstrate prejudice or unfairness in the administrative proceedings." *Key v. Heckler*, 754 F.2d 1545, 1551 (9th Cir. 1985) (citing *Vidal v. Harris*, 637 F.2d 710, 713 (9th Cir. 1981)). Thus, the critical issue is whether the administrative proceeding was fair, not whether the claimant properly waived his right to counsel. *Vidal*, 637 F.2d at 714 ("[T]he issue is not whether the right to representation was knowingly waived, rather, it is whether, in the absence of representation, the administrative law judge met the heavy burden imposed by [*Cox v. Califano*, 587 F.2d 988 (9th Cir. 1978)]"); *see also Higbee v. Sullivan*, 975 F.2d 558, 561-62 (9th Cir. 1992) (per curiam).

Where a claimant is unrepresented by counsel, it is "incumbent upon the ALJ to conscientiously and scrupulously probe into, inquire of, and explore all the relevant facts" at the hearing so as to protect the claimant's interests. *Cox*, 587 F.2d at 991; *see also Higbee*, 975 F.2d at 561; *Key*, 754 F.2d at 1551; *Vidal*, 637 F.2d at 713-14. When the "heavy burden imposed by *Cox*" is not met in this context, and the unrepresented claimant may have been prejudiced, "the interests of justice demand that the case be remanded." *Vidal*, 637 F.2d at 714-15.

Plaintiff has not argued that the ALJ failed to fully and fairly develop the record in this case. It appears Plaintiff's counsel was submitting documents before and after the administrative hearing and even after the ALJ had issued his decision. Despite this fact, there are practically no records that document treatment during the specific period for which Plaintiff seeks disability benefits, the period

from July 4, 1999 to June 30, 2000. Plaintiff has failed to show that he was prejudiced by the ALJ denying Mr. Walkup's request to appear telephonically.

### 3. Appeals Council's rejection of Dr. Heuser's opinion

Plaintiff argues that the Appeals Council failed to provide clear and convincing reasons for rejecting the opinion of Dr. Gunnar Heuser, who he claims is his treating physician. (Pl.'s Mem. 6.) Plaintiff argues that Dr. Heuser found him disabled since April 2000. (*Id.*) A letter dated May 26, 2009 from Dr. Heuser was submitted after the ALJ issued his decision, but was considered, and rejected, by the Appeals Council on reconsideration. (AR at 1.)

In Dr. Heuser's May 26, 2009 letter, he indicated that he initially saw Plaintiff on April 4, 2000 and "then at intervals over the years." (AR at 23.) Dr. Heuser reported in his letter that he reviewed the records from numerous doctors, including Dr. Rea, Dr. Wasserberger and others. After reviewing these records, the doctor concluded, "The patient reacts strongly to everyday chemicals in his environment and is therefore in my opinion, totally disabled and has been since his initial consultation." (AR at 24.) Dr. Heuser's letter was submitted after the ALJ had issued his decision on April 1, 2008. The Appeals Council rejected the letter, because it was dated May 26, 2009, which was after Plaintiff's DLI. (AR at 1.) The Appeals Council concluded, "Therefore, it does not affect the decision about whether you were disabled at the time you were last insured for disability benefits." (AR at 2.)

The Appeals Council properly rejected Dr. Heuser's opinion. Social Security regulations provide that where new and material evidence is submitted to the Appeals Council with the request for review, the entire record will be evaluated and review of the ALJ's decision will be granted where the Appeals Council finds that the ALJ's action, findings, or conclusion is contrary to the weight of the evidence currently of record. 20 C.F.R. § 404.970. Because the post-decision evidence was considered by the Appeals Council, it is part of the record on review by this Court. *Ramirez v. Shalala*, 8 F.3d 1449, 1452 (9th Cir. 1993); *Gomez v. Chater*, 74 F.3d 967, 971 (9th Cir. 1996). The court may remand a case in light of new evidence when the new evidence is material to the disability determination and the claimant has shown good cause for failing to present the information earlier. *Mayes v. Massanari*, 276 F.3d 453, 462 (9th Cir. 2001). To be material, the

new evidence must bear "directly and substantially on the matter in dispute." *Id.* Material evidence should relate to the period on or before the date of the ALJ's decision. *See* 20 C.F.R. § 404.970. The claimant must also demonstrate a "reasonable possibility" that the new evidence would have changed the disability determination. *Mayes*, 276 F.3d at 462.

While Dr. Heuser's letter relates to a period before the ALJ's decision, Plaintiff has failed to show that the "new evidence" would have changed the disability determination. As previously discussed, the weight of the evidence supports the ALJ's finding of not disabled. While Plaintiff claims Dr. Heuser was a "treating physician," no treatment notes accompany Dr. Heuser's letter. The ALJ need not accept an opinion of a treating physician if it is "conclusionary and brief and unsupported by clinical findings." *Matney*, 981 F.2d at 1019. Finally, Plaintiff has failed to show good cause for failing to present the letter earlier. This Court concludes that the Appeals Council did not err in rejecting Dr. Heuser's opinion and denying the request for review.

### V. Conclusion

After a thorough review of the record and the papers submitted and based on the reasons discussed above, this Court finds the ALJ's decision that Plaintiff could sustain jobs that constitute substantial gainful activity and that exist in significant numbers in the regional and national economies was supported by substantial evidence in the record and was not based on legal error. Accordingly, this Court recommends Plaintiff's motion for summary judgment be **DENIED** and the Commissioner's cross-motion for summary judgment be **GRANTED**.

This Report and Recommendation is submitted to the United States District Judge assigned to this case pursuant to 28 U.S.C. § 636(b)(1). Any party may file written objections with the Court and serve a copy on all parties on or before **January 13, 2011**. The document should be captioned "Objections to Report and Recommendation." Any reply to the objections shall be filed and served **no later than 10 days after being served with the Objections**.

**IT IS SO ORDERED.**

DATED: December 30, 2010

_____
**CATHY ANN BENCIVENGO**
United States Magistrate Judge